**UNITED STATED DISTRICT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| STACY D. SLOAN, ADMINISTRATOR OF THE ESTATE OF SHANNON S. SLOAN, DECEASED<br>c/o McKinzie and Associates<br>529 White Pond Drive<br>Akron, Ohio 44320-1123<br><br>    Plaintiff,<br><br>-vs-<br><br>ANDREW BLUBAUGH, POLICE OFFICER<br>c/o City of Wadsworth Police Department<br>120 Maple Street<br>Wadsworth, OH 44281<br><br>    And<br><br>MATTHEW HOLDRIDGE, POLICE OFFICER<br>c/o City of Wadsworth Police Department<br>120 Maple Street<br>Wadsworth, OH 44281<br><br>    And<br><br>DAN CHAFIN, CHIEF OF POLICE, CITY OF WADSWORTH POLICE DEPARTMENT<br>c/o City of Wadsworth Police Department<br>120 Maple Street<br>Wadsworth, OH 44281,<br><br>    Defendants. | JUDGE BRIDGET MEEHAN BRENNAN<br><br>CASE NO.1:24-CV-2079<br><br>FIRST AMENDED COMPLAINT WITH JURY DEMAND |

Plaintiff, Stacy D. Sloan, the Administrator of the Estate of Shannon E. Sloan submits this

Complaint against Defendants police officers and Chief of Police, Daniel Chafin, and states as

follows:

1

## Introduction

1. On June 18, 2024, at approximately 9:00 PM, Decedent, Shannon E. Sloan, age 47, was shot multiple times by City of Wadsworth, Ohio police officer Defendants Andrew Blubaugh and Matthew Holdridge while Mr. Sloan was sitting in a chair in his backyard at 223 Durling Drive, Wadsworth, Ohio 44281. Mr. Sloan's wife, Stacy Sloan and a neighbor called 911 for this emergency because she was concerned about her husband's mental health and potential suicide. Rather than providing generally accepted mental health, crisis intervention measures, and de-escalation tactics to protect Mr. Sloan - who did not pose an immediate or imminent threat to anyone – Defendants Blubaugh and Holdridge used unnecessary, reckless and excessive deadly force by shooting Mr. Sloan and causing his death.

2. Defendant Daniel Chafin, the City of Wadsworth Chief of Police at the time of the incident, was the highest policymaker overseeing the members of the Wadsworth Police Department. His role and duties were to manage, supervise, and train officers to protect citizens, including Mr. Sloan, by ensuring his officers followed policies, procedures, and training that would have prevented this tragedy. He failed in his role and duties leading to the wrongful death of decedent Shannon Sloan which could have been avoided.

## Jurisdiction and Venue

This action is brought pursuant to Ohio and Federal law. Jurisdiction is appropriate as these claims arose from events occurring in Medina County in the State of Ohio, Plaintiff is a resident of Ohio, and at all times mentioned herein, Defendant either resided in or conducted business in the State of Ohio. The Jurisdiction of the court is also invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983 *et seq*; the Judicial Code, §§ 1331 and

1343(a); and the Constitution of the United States as well as violations State of Ohio Laws, the Ohio Constitution, Article IV, § 4(A) and Ohio R.C. §§ 2305.01.

### Parties

3.  Plaintiff, Stacy D. Sloan, is the administrator of the estate of Shannon Sloan, who, at all times relevant to the allegations made in this Complaint, resided in Medina County, Ohio.

4.  Defendant officer Andrew Blubaugh, as referred in this complaint, at all times relevant to the allegations in this Complaint, was a duly appointed police officer employed by the City of Wadsworth, Ohio, acting within the scope of his employment and under the color of law, and in his individual capacity.

5.  Defendant officer Matthew Holdridge, as referred in this complaint, at all times relevant to the allegations in this complaint, was a duly appointed police officer employed by the City of Wadsworth, Ohio, acting within the scope of his employment and under the color of law, and in his individual capacity.

6.  Defendant Daniel Chafin, as referred to in this complaint, at all times relevant to the allegations in this complaint, is the duly sworn Chief of Police of the City of Wadsworth. He is responsible under law for overseeing the entire police department, including ensuring that all laws and regulations are enforced by his officers and employees, to protect the citizens of the city, including Decedent Shannon E. Sloan. Defendant Chafin was acting under color of law. He is being sued in his individual and official capacity.

### Facts

7.  On June 18, 2024, Plaintiff Stacy Sloan, the wife of Decedent, Shannon Sloan, was at their home located at 223 Durling Drive in Wadsworth Ohio sometime before 9:00 PM, when

3

she saw Shannon pointing a handgun to his chest and said he was "going to take care of this."

8. Because she was concerned about Shannon's safety, Stacy called 911 and told the dispatcher that Shannon held a gun to his chest, and she believed he might be suicidal. A neighbor also called 911 for the same emergency.

9. Stacy was waiting in the front yard for the first responders to arrive while her husband was in the backyard, sitting in a chair. She was expecting trained mental health professionals or negotiators to intervene to diffuse the situation and get him help. There were no other people at the house, other than she and her husband. At no time did Shannon threaten her or anyone else with any violence or physical harm.

10. Rather than approaching the 911 call with a plan to diffuse the situation, at least four uniformed police officers, including Blubaugh and Holdridge, some armed with automatic military style assault rifles, and parked their cruisers, not at the residence, but blocks away. The officers rushed through the neighborhood toward the residence, crossing yards, using the element of surprise to prevent Shannon from knowing police were coming in his direction, as he sat alone, in a chair, in his backyard.

11. When the emergency calls came into the Wadsworth Police Department, two supervisors were alerted to 911 calls. The supervisors communicated by police radio with the police officers who were dispatched to the area. The supervisors, as indicated below, followed the deployment and created a plan to deal with the Sloan crisis.

12. Through discovery obtained by Plaintiff's counsel, these two supervisors, both sergeants, were subject to recorded interviews months after the incident, as part of an internal administrative investigation. The two sergeants were interviewed separately but were on

4

"the same page" as to the systematic failure of the officers, especially Defendants Blubaugh and Holdridge, as to their negligent or intentional disregard of the planned tactical approach to the mental health crisis emergency of Shannon Sloan.

13. These experienced supervisors had plenty of resources on hand to deal with a potential suicide situation, including the deployment of a drone to track any movements of Mr. Sloan and the adjacent area, and a trained department negotiator ready to engage and communicate with Mr. Sloan to diffuse the mental health crisis he was experiencing.  The goal of the supervisors, based on policies and training, was not to aggressively confront Mr. Sloan, but to allow measured crisis intervention procedures to achieve a positive and safe ending.

14. The supervisors called for the responding officers to set up a perimeter to seal off the area near the home that would contain the public and allow officers and supporting personnel to de-escalate the crisis.  The supervisors, at least one of them on their way to the scene, also communicated to the officers on the ground to get Shannon Sloan's cell phone number so the negotiator could contact him, but the officers, including Defendants Blubaugh and Holdridge ignored the orders.

15. The supervisors also radioed the officers on the ground to keep their distance from the Sloan house until the above-mentioned de-escalation maneuvers could be in place; however, the officers, including Defendants Blubaugh and Holdridge, as well as two additional officers, did not follow up with the supervisors' approach plan.

16. Against the guidance and orders of the supervisors, the four officers decided to run to the Sloan house with their guns ready to fire and confront Shannon Sloan. This was a reckless

5

move, without the benefit of the resources which were on the way, creating a high risk of a potential deadly encounter.

17.  Furthermore, the four officers who recklessly ran to the house did not communicate with each other, another failure of command, control, and containment. Each officer who approached the house had no idea what the other officers were thinking or doing, violating basic police tactics.

18. Both supervisors monitoring the situation believed that there was no urgency for police responders to skip the deployment of the drone, setting up the perimeter, the use of the negotiator who had arrived at the scene with a supervisor, because the supervisors did not believe Mr. Shannon was a threat to anyone other than himself and was not committing any crimes: just sitting on a seat in his backyard.

19. When the group of police arrived to the house, Stacy Sloan was standing in front of the house to meet the officers. Rather than talking to her to obtain critical information to assist the officers in communicating with Shannon, and to discuss the circumstances and condition of her husband for a safe approach, the officers instructed her to stay back.

20. Moments later, at approximately 9:00 PM, multiple shots were fired at Mr. Sloan by Defendants Blubaugh and Holdridge from the rear of the house resulting in the killing of Shannon Sloan. The shots came from the department issued automatic assault rifle used by Defendant Blubaugh and from the department issued automatic handgun used by Defendant Holdridge. After Mr. Sloan was mortally wounded on the ground, first aid was attempted by several officers who arrived. Mr. Sloan was taken to a hospital by ambulance and underwent treatment, but he succumbed to the injuries.

21. A few days later, two bodycam videos were disclosed by defendant Chief of Police Chafin. Defendant Chief Chafin stated that the shooter, Defendant Blubaugh, did not wear a bodycam, so there is no video of what he might have seen when he fired his gun. But there is a bodycam video from another officer positioned some feet behind Defendant Blubaugh which showed Blubaugh at the corner of the rear of the house firing his gun without any warning that he was a police officer.

22. The video shows Defendant Blubaugh, approximately two seconds before the shooting shouting: "hey, hey, hey, don't, don't, don't, put it down." Within seconds he fired multiple rapid shots toward Shannon Sloan with his automatic rifle. Rather than concealing himself behind the side of the house, out of view of Mr. Sloan, he exposed himself and fired his weapon without any warnings.

23. The Wadsworth Police Department did not conduct the criminal investigation of the shooting but instead requested the Ohio Bureau of Criminal Investigations (BCI) to take over the investigation. BCI provided the investigation file to Plaintiff's counsel, which included a recorded interview of Defendant Matthew Holdridge, a police officer with only one year on the job, who revealed that he also fired approximately five rounds at Shannon Sloan while he positioned himself on the rooftop looking down at Shannon. He climbed up a ladder which was leaning against the wall on the other side of house from where Blubaugh fired his rifle.  Holdridge revealed that he fired at Mr. Sloan from the rooftop, not because he observed any imminent threat toward him or others, but because he heard shots fired, and mistakenly and recklessly assumed the shots were fired by Shannon. Neither Blubaugh nor Holdridge knew where the other was positioned, nor that both officers fired their weapons.

7

24. BCI also conducted a recorded interview with Defendant Andrew Blubaugh. In his interview, Blubaugh claimed that he "took a peek" by looking around the corner to see Mr. Sloan. Blubaugh told BCI that Shannon had a gun on his lap and "he grabbed it and just brought it up and he didn't bring it up to, he didn't bring it up high enough to point it at anybody else, I wasn't going to allow him to, and um, that's when I uh I engaged him with the patrol rifle".

25. Blubaugh also told BCI that when he arrived at the northeast corner of the house, he realized he didn't have his body camera, but he failed to retreat and let one of the other officers who did have had bodycams to be able to record the incident. Moreover, at the time he fired shots, according to the interview, Blubaugh said Shannon was facing the back of the yard and not facing toward him and "the fact that Sloan did not change his body language or have a reaction to his commands or attempt at conversation was unnerving."

26. News reports, soon after the incident, claimed that sources from the department had "confirmed" that Shannon had allegedly pointed a firearm at a female bystander and one or more Wadsworth police officers, which led to shots by "officers" from WPD. The reports were not true.

27. When learning of this reporting, Plaintiff Stacy Sloan immediately called Defendant Chief Chafin to discuss the same news broadcast. Chafin told Plaintiff that no one from the police department told the media that Shannon Sloan raised a firearm at anyone because "he didn't point a gun at anyone."

28. Degan Sloan, the 24-year-old son of Stacey and Shannon Sloan, was made aware of the same news report, but did not know his mother, Stacey, had called defendant Chafin.  On his own, he called Defendant Chafin to discuss the news report. The Chief specifically told

Degan "rest assured, that your father had not pointed the gun at the police" and that my father "had not pointed the gun at anyone."

29. Degan was also told in his conversation with Chafin that the chief was upset seeing the same report and attempted to determine who had provided the media with that report.

30. These two family members, at different times independent of each other, were told by Chief Chafin, who was apparently privy to information regarding the shooting, that Shannon Sloan did not point his gun before he was shot and therefore posed no imminent or immediate threat to justify the use of deadly force against Shannon.

31. Based on the above totality of circumstances, including the videos, the admissions of the Chief who oversees the department, the interviews of the officers involved, the manner in which the mental health crisis call was responded to, the failure to enlist crisis intervention techniques, failure to engage in negotiations to diffuse any threat, and the failure to follow generally accepted de-escalation measures, demonstrates that the actions of both Defendants Blubaugh and Holdridge were reckless, unnecessary, and constituted violations of federal and state law.

32. Defendant Chief Chafin is the chief policymaker of the Wadsworth Police Department. He is responsible for ensuring his police officers are properly trained in procedures and tactics to deal with a mental health crisis call. The actions of Defendant officers, along with the other deployed officers who recklessly responded to a mental health crisis, violated basic police protocols widely accepted in Ohio and across the country, which require concealment, containment, communication, and control when approaching a potential subject.

9

33. When responding to a mental health call with no threats of any criminal activity – officers must be trained to approach these situations in a way that opens communications with family and the subject, with professional negotiators and mental health professionals at the scene. None of these protocols were followed. Chief Chafin's failure to train, supervise, and enforce appropriate standards, predictably led to the excessive use of deadly force, and is a moving force in the death of Shannon Sloan.

34. The wrongful death of Shannon Sloan was the proximate result of the unlawful shooting death by Defendants Blubaugh and Holdridge. Mr. Sloan was a law-abiding citizen, loving husband of Stacy Sloan, and father of two adult children, Degan Sloan, Ryleigh Dotterer, as well as extended family members and friends. He was gainfully employed at the time of his death, leaving his wife and 24-year-old son, Degan, who depended on Shannon's source of income. His next of kin have also suffered serious mental anguish over Shannon's death, and the loss of the society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, and counsel.

**First Claim for Relief:**

**State Law Wrongful Death Claim Pursuant to Ohio R.C. § 2125.02**

35. Plaintiff repeats and realleges the above allegations as if fully set forth herein.

36. Defendants' willful, wanton, reckless, negligent and intentional conduct caused the wrongful death of Shannon Sloan.

37. As a direct and proximate result of defendants' conduct and actions alleged in this complaint, Shannon Sloan died of the gunshot wounds inflicted by Defendants Blubaugh and Holdridge on June 18, 2024, subjecting Defendants to liability pursuant to Ohio R.C. § 2125.02.

38. The decedent is survived by his heirs, who are represented by the Plaintiff in this action. Decedent's heirs have suffered pecuniary loss, experienced permanent emotional distress, loss of decedent's aide, comfort, society, companionship, guidance, and protection, and have otherwise suffered damages to their detriment.

## Second Claim for Relief:

## State Law Claim for Survivorship

39. Plaintiff repeats and realleges the above allegations as if fully set forth herein.

40. As Administrator of the Estate of the Decedent, the Plaintiff brings this action for the injuries and damages to Shannon Sloan prior to his death for the benefit of his Estate.

41. As a result of the above-described willful, wanton, reckless, negligent, intentional, and misconduct of Defendants, Shannon Sloan suffered the injuries described in the above paragraphs.

42. Shannon Sloan sustained pain and suffering because of his injuries that ultimately resulted in his death.

## Third Claim for Relief:

## State Law Claim for Negligence—Reckless Conduct

43. Plaintiff repeats and realleges the above allegations as if fully set forth herein.

44. At all times relevant herein, Defendants had a duty to the public at large, including decedent Shannon Sloan, to exercise due care and to act in a lawful and reasonable manner and to not act in a willful, wanton, reckless, negligent, and intentional manner.

45. Defendants owed Shannon Sloan a duty of care, and their breach of duty was the direct and proximate cause of Shannon Sloan's suffering and death.

46. Defendants acted negligently and recklessly when they violated their duty to exercise due care for Shannon Sloan.

47. At all times relevant herein, Defendants knew or should have known that their conduct would or could cause serious physical injury to Shannon Sloan and they disregarded that knowledge.

48. Defendants' conduct directly and proximately caused the injuries and damages suffered by Shannon Sloan, his Estate, and his beneficiaries as described above.

**Fourth Claim for Relief:**

**State Law Claim for Intentional or Negligent Infliction of Severe Emotional Distress**

49. Plaintiff repeats and realleges the above allegations as if fully set forth herein.

50. Defendants Blubaugh and Holdridge engaged in extreme and outrageous behavior or recklessness as alleged in this Complaint.

51. Defendants Blubaugh and Holdridge intended such conduct to inflict severe emotional distress upon Stacy Shannon who was present during the shooting, as well decedents' heirs and next of kin.  Defendants Blubaugh and Holdridge knew their conduct would cause Shannon's immediate family severe and serious emotional distress, which was of a nature that no reasonable person could be expected to endure.

52.  Defendants conduct did, in fact, cause such distress, and as a direct and proximate result of Defendants 'outrageous conduct, Stacy Sloan the decedent's family were injured and suffered actual damages.

12

**Fifth Claim for Relief:**

**42 U.S.C. § 1983 Claim for Unconstitutional Seizure**

53. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint and includes them in this count as if they were fully set out here.

54. The actions of Defendants Blubaugh and Holdridge, as alleged in the preceding paragraphs, violated Shannon Sloan's rights under the Fourth Amendment to the United States Constitution to be secure in his person against unreasonable seizure, and his right to due process under the Fourteenth Amendment to the United States Constitution, and caused the injuries and death alleged in this Complaint.

55. Defendants conduct and actions, as alleged in this count of the Complaint, were the direct and proximate cause of the constitutional violations set forth.

**Sixth Claim for Relief:**

**42 U.S.C. Section 1983 Claim Against Defendant Chief of Police Daniel Chafin as the Final Policymaker and Supervisor**

56. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs of this Complaint and includes them in this count as if they were fully set out here.

57. Defendant Chafin is the Final Policymaker of the Wadsworth Police Department.

58. Chafin's inadequate supervision, training and policymaking - as alleged in this complaint – was a moving force in causing the constitutional misconduct by his police officers. These officers, especially Defendants Blubaugh and Holdridge were called to help Shannon Sloan during a mental health crisis but instead used excessive deadly force against Shannon Sloan.

59. The conduct of his officers by deploying themselves in a clandestine military style ambush, using assault rifles, and disregarding generally accepted police protocols and tactics were

13

unreasonable and fatal. These failures were the result of a police department that dropped the ball in failing to follow safe measures set forth above to protect life, by the acquiescence of dangerous actions such as sneaking up on Shannon Sloan without any announcement they were police officers and then shooting multiple times Shannon Sloan who was sitting alone in the backyard who did not pose an immediate threat to the officers.

60. Such conduct was egregious and would not have occurred if proper supervision, training and policies were enforced by Defendant Chafin. His inadequate supervision predictably led to this fatal tragedy.

**Prayer for Relief:**

The Plaintiff demands that judgment be entered in their favor on all counts and prays the Court to award the following relief:

a.  An award of actual and/or compensatory damages to be determined at trial;

b.  An award of punitive damages in an amount to be determined at trial; and

c.  An award of such other and further relief as the Court may deem just and proper.

**Trial By Jury on all Claims for Relief Hereby Demanded.**

Respectfully submitted,

*/s/ Timothy D. McKinzie*
**McKinzie and Associates**
Timothy D. McKinzie (#0061493)
Aric J. Stano (#0090815)
529 White Pond Drive
Akron, Ohio 44320-1123
P: (330) 864-3100
F: (330) 572-2931
tim@mckinzielaw.com
*Attorneys for Plaintiff*

/s/ Terry H. Gilbert
Terry H. Gilbert (0021948)
**Friedman, Gilbert + Gerhardstein**
50 Public Square, Suite 1900
Cleveland, OH 44113-2205
T: 216.241.1430
F: 216.621.0427
terry@FGGfirm.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2025, a copy of the foregoing was filed electronically with the Court's e-filing system. On this same date I served an electronic copy of the foregoing document via email as follows:

Steven K. Kelley: skelley@mrrlaw.com
Zachary W. Anderson: zanderson@mrrlaw.com
*Counsel for Chief Dan Chafin*

/s/ Terry H. Gilbert
Terry H. Gilbert
*Counsel for Plaintiff*